MATHEW J. SPIESMAN, JR., AND MARY SPIESMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56141.  Filed May 31, 1957.

*Myron E. Anderson, Esq.*, for the petitioner.
*Wendell M. Basye, Esq.*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in the income tax of the petitioners and additions to tax as follows:

| Year | Deficiency | Additions to tax sec. 294 (d) (2) |
|---|---|---|
| 1951 | $2, 155. 22 | $356. 93 |
| 1952 | 14, 056. 20 | 986. 14 |

Respondent, on brief, has abandoned his determination that petitioners are liable for additions to tax for the years involved under section 294 (d) (2) of the Internal Revenue Code of 1939.  Petitioners, at the hearing and on brief, have conceded or abandoned all other issues raised by the pleadings except one.  The only question presented is whether the five minor children of petitioners were partners in the Spiesman & Sons partnership during the years 1951 and 1952, within the meaning of sections 191 and 3797 (a) (2) of the Internal Revenue Code of 1939, as amended by section 340 (a) and (b) of the Revenue Act of 1951.

### FINDINGS OF FACT.

Some of the facts were stipulated and are included herein by this reference.

Petitioners are husband and wife residing at St. Maries, Idaho. They filed a joint Federal income tax return for the calendar year 1951 with the then collector of internal revenue for the district of Idaho, and for the calendar year 1952 with the district director of internal revenue, Boise, Idaho.

Prior to 1950, petitioner Mathew J. Spiesman, Jr. (hereinafter sometimes referred to as Spiesman), was the owner of certain gambling

devices commonly known as slot machines. These machines were operated in a bar known as the Gem State Club under an agreement between Spiesman and the club, whereby Spiesman received 20 per cent of the receipts from the slot machines. Spiesman was president and manager of the Gem State Club, a corporation. In 1947 the legislature of the State of Idaho enacted a statute (Session Laws 1947, ch. 151; secs. 50–1501 to 1510, inclusive, Idaho Code), subsequently declared unconstitutional [1] and repealed,[2] providing that it should be lawful for any person to own and operate coin-operated amusement devices within the corporate limits of any incorporated city or village, after having first procured a license as therein provided. The term "person" was defined to include "an individual person, partnership, corporation or association."

On February 1, 1950, Spiesman, Jr., and his father, Mathew J. Spiesman, Sr., entered into a partnership agreement for the purpose of carrying on the business of operating and maintaining coin-operated amusement devices. The agreement recited that "the assets to be taken over by the partnership are in the possession and owned by the partner, M. J. Spiesman, Jr." It further recited that "M. J. Spiesman, Sr., agrees to pay a sum equal to one-half the value of the assets"; that they should bear "equally between them all licenses, fees, permits and other expenses" required for the support and management of the business; and that profits from the business should be divided, one-third to Spiesman, Sr., and two-thirds to Spiesman, Jr.

Spiesman, Sr., now 80 years of age, had for several years been distributing part of his estate by making gifts of real estate, stocks, and mortgages to Spiesman, Jr., and to the latter's five sons, whose names and dates of birth are as follows:

| Name | Date of Birth |
|---|---|
| Michael Joseph | Oct. 21, 1940 |
| Philip James | Nov. 29, 1943 |
| Leonard John | Feb. 11, 1945 |
| Mathew James III | July 3, 1946 |
| Francis Edward | Sept. 26, 1950 |

On December 1, 1951, a new partnership agreement was entered into between Spiesman, Sr., and Spiesman, Jr., individually and on behalf of his five minor sons, which (omitting the jurat) is as follows:

### PARTNERSHIP AGREEMENT.

THIS AGREEMENT OF PARTNERSHIP, made in duplicate as of the first day of December, 1951, by and between Mathew James Spiesman, Sr., Mathew James Spiesman, Jr., Michael James [Joseph] Spiesman, Mathew James Spiesman, III,

---

[1] *State v. Village of Garden City*, (Dec. 23, 1953) 74 Idaho 513, 265 P. 2d 328, holding Session Laws 1947, ch. 151, declaring coin-operated devices as gambling devices but not lotteries, violated article 3, sec. 20 of the Idaho constitution, since such devices are lotteries. See also *State ex rel. Nielson* v. *City of Gooding*, 75 Idaho 36, 266 P. 2d 655.

[2] Session Laws 1953, ch. 62, sec. 1, p. 82.

Philip James Spiesman, Leonard John Spiesman, and Francis Edward Spiesman, all of St. Maries, Benewah County, Idaho,

WITNESSETH, that the said parties have agreed and by these presents do agree to associate themselves as partners for the purpose of carrying on the business of operation and maintenance of coin-operated amusement devices, and incidental concessions connected therewith, to the faithful performance of which they mutually bind and engage themselves, each to the other, their executors and administrators.

FIRST: The name, style and title of such partnership shall be SPIESMAN & SONS.

SECOND: At the time of this agreement, the assets to be taken over by the partnership are in possession and owned by the partner[s], Mathew James Spiesman, Jr., [and Matthew J. Spiesman, Sr.] and are in the value of $2374.63. The capital of said partnership in addition to the aforementioned assets shall consist of cash contributions divided into nine equal shares, of which each of the partners shall own one-ninth, with the exception of the partner, Mathew James Spiesman, Jr., who shall own one-third of the shares. Further cash contributions shall consist of:

/s/ M J Spiesman Jr.
/s/ M J Spiesman Sr.

| | |
|---|---|
| Michael James [sic] Spiesman | $100.00 |
| Mathew James Spiesman, III | 100.00 |
| Philip James Spiesman | 100.00 |
| Leonard John Spiesman | 100.00 |
| Francis Edward Spiesman | 100.00 |

The capital of the partnership in addition to the initial cash contributions enumerated above shall also consist of the income and profits arising from the employment thereof, with the exception of that which each is entitled to withdraw as hereinafter provided. That said capital may at any time be reduced or extended by agreement between the parties hereto, and that the said capital, together with all credits, goods, wares or commodities bought or obtained by the said firm, by barter or otherwise, shall be kept, used and employed in and about the business aforesaid.

THIRD: The term for which this partnership is organized is for an indefinite period from and after December 1, 1951.

FOURTH: *Duties of Partners.* The partner, Mathew James Spiesman, Jr., shall be actively in charge of the business and shall assume the functions customarily performed and shall perform the duties as manager. He shall devote a major portion of his time, attention, experience and endeavors to said business. The partners, Mathew James Spiesman, Sr., Michael James [sic] Spiesman, Mathew James Spiesman, III, Philip James Spiesman, Leonard John Spiesman and Francis Edward Spiesman, shall and will at all times during the continuance of the partnership bear, pay and discharge equally with all partners all the licenses, fees, permits and other expenses that may be required for the support and maintenance of said business.

FIFTH: *Books of Account.* That there shall be kept at all times during the continuance of the partnership, a perfect, just and true set of books of accounts, wherein each of the said partners shall enter and set down, as well all money by them, or any of them, received, paid, laid out, and expended in and about the said business, as also all the goods, wares, commodities, and merchandise by them, or any of them, bought or sold, by reason or on account of the said business, and all other matters and things whatsoever to the said business and management thereof in anywise belonging; which said books shall be used in

common between the said partners, so that any of them may have access thereto without any interruption or hindrance of any of the others; that the said partners quarterly during the continuance of the said partnership, as aforesaid, to wit, on the first day of January, April, July, and October in each year, or oftener if necessary, shall make, yield, and render, each to the other, a true, just and perfect inventory and account of all the profits and increase by them, or any of them, made, and of all loss by them, or any of them, sustained; and also of all payments, receipts, and disbursements, and of all other things by them made, received, disbursed, acted, or suffered, in their said business, and the same account being so made, they shall and will clear and adjust, each to the other, at the time, their just share of the profits so made as aforesaid.

SIXTH: Monies of the partnership shall be deposited in the Farmers & Merchants Bank, Rockford, Washington. All expenses of the business shall be first paid, and no partner is to draw any salary except out of the profits of the business. Accurate books shall be kept at all times. All bills and liabilities shall be paid by check and the books of the partnership shall be open to inspection of each partner at any time.

SEVENTH: *Share in Profits.* Periodically, at either monthly or quarterly intervals, each partner shall be entitled to withdraw from the business as a salary an amount of income commensurate with the capital stock owned by them and the services which they have contributed; however, under no circumstances shall said withdrawals impair the operating capital of the partnership. No further withdrawals shall be made in the form of profit after payment of salaries to the partners until such time as all indebtedness owing by the partnership has been paid.

In addition to the above-mentioned share in the profits, the partner, Mathew James Spiesman, Jr., shall draw as salary for managing the partnership business, the sum of Two Hundred Fifty ($250) Dollars per month.

EIGHTH: *Dissolution of Partnership.* In the event of dissolution of the partnership by reason of death, withdrawal or any other act of any partner or partners before the expiration of said term, the remaining partner or partners may if desired have the right to purchase the interest or interests of said partner or partners in the business assets and good will by paying a reasonable value of such interest or interests. Upon such payment, the retiring partner or partners, or his representatives, or the representatives of his estate, shall execute and deliver to the remaining member or members all necessary conveyances of said interest or interests. The continuing member or members shall assume all of the existing firm obligations and shall be entitled to continue using the firm name unrestricted as to the length of time during which it may be used or its sale or assignment.

TENTH [sic]: *Acts Not To Be Done Without Consent.* (a) None of the partners hereto during the continuance of this partnership shall assume any liability for another or others by means of endorsement or by becoming guarantor or surety or in any other manner even though not specifically mentioned herein, without first obtaining the consent of the other parties hereto in writing (b) No partner shall have the authority to do any act in contravention of these Articles. (c) No partner shall have the authority to do any act that would make it impossible to carry on the ordinary business of the partnership. (d) No partner shall confess a judgment. (e) No partner shall have the authority or power to possess partnership property or assign their rights in specific partnership property for other than a partnership purpose. (f) No partner shall have the authority to admit any other person or persons as a general partner. (g) No partner shall have the authority to admit any

person or persons as a limited partner unless the right to do so is agreed upon by all other partners in writing.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year in this partnership agreement first above written.

[s]   Mathew James Spiesman

MATHEW JAMES SPIESMAN, SR.

[s]   Matthew James Spiesman, Jr.

MATHEW JAMES SPIESMAN, JR.

[s]   Michael Joseph Spiesman

[s]   Matthew James Spiesman III

[s]   Phillip James Spiesman

[s]   Leonard John Spiesman

[s]   Francis Edw Spiesman

By [s]   M J Spiesman Jr.

Guardian for Michael James [*sic*] Spiesman, Mathew James Spiesman III, Philip James Spiesman, Leonard John Spiesman, Francis Edward Spiesman.

NOTE: Brackets represent interlineations.

The interlineations appearing in paragraph numbered "Second," were inserted by Spiesman, Jr., in 1953, after the initiation of the investigation of petitioners' income tax returns for the years involved. The $100 cash contributions on behalf of each of the minor children were made by their father either from funds belonging to them or advanced by him.

A partnership return (Form 1065) was filed by Spiesman & Sons for the period beginning December 1, 1951, and ending January 1, 1952, showing net earnings in the amount of $3,254.30, distributable as follows:

| | |
|---|---|
| Mathew J. Spiesman, I | $361.59 |
| Mathew J. Spiesman, II | 1,084.76 |
| Mathew J. Spiesman, III | 361.59 |
| Philip Spiesman | 361.59 |
| Michael Joe Spiesman | 361.59 |
| Francis Spiesman | 361.59 |
| Leonard Spiesman | 361.59 |

No withdrawals for this period were shown and the capital accounts of each of the above-named partners at the beginning of the period and at the end of the period were shown as follows:

| | Beginning of period | End of period |
|---|---|---|
| Mathew J. Spiesman, I | $100.00 | $461.59 |
| Mathew J Spiesman, II | 2,774.63 | 3,859.39 |
| Mathew J. Spiesman, III | 100.00 | 461.59 |
| Philip Spiesman | 100.00 | 461.59 |
| Michael Joe Spiesman | 100.00 | 461.59 |
| Francis Spiesman | 100.00 | 461.59 |
| Leonard Spiesman | 100.00 | 461.59 |

A partnership return (Form 1065) was filed by Spiesman & Sons for the year 1952 showing net earnings in the amount of $46,021.71, distributable as follows:

| | |
|---|---|
| Mathew J. Spiesman, I | $4,846.85 |
| Mathew J. Spiesman, II | [1] 16,940.61 |
| Mathew J. Spiesman, III | 4,846.85 |
| Philip Spiesman | 4,846.85 |
| Michael Joe Spiesman | 4,846.85 |
| Francis Spiesman | 4,846.85 |
| Leonard Spiesman | 4,846.85 |

[1] On briefs (request for finding number 9) petitioners assert, and respondent agrees, that "included in the $16,940.61, distributable share of Mathew J. Spiesman, Jr., is salary for services rendered of $2,400 and distribution of earnings of $14,540.61."

The capital account of each of the above-named partners at the beginning of the year, withdrawals, and the capital account at the end of the year were shown as follows:

| | Capital account at beginning of year | Withdrawals | Capital account at end of year |
|---|---|---|---|
| Mathew J. Spiesman, I | $461.59 | $3,688.83 | $1,619.61 |
| Mathew J. Spiesman, II | 3,859.39 | 16,768.68 | 4,031.32 |
| Mathew J. Spiesman, III | 461.59 | 4,690.16 | 618.28 |
| Philip Spiesman | 461.59 | 2,592.80 | 2,715.64 |
| Michael Joe Spiesman | 461.59 | 2,593.25 | 2,715.19 |
| Francis Spiesman | 461.59 | 3,448.01 | 1,860.43 |
| Leonard Spiesman | 461.59 | 4,950.96 | 357.48 |

The income shown on the partnership returns was derived from the operation of the slot machines and other coin-operated amusement devices, most of which were located in the Gem State Club and continued to be operated under the original agreement as to percentages entered into between Spiesman and the club prior to the formation of the partnerships between Spiesman and his father, and Spiesman & Sons. All licenses for the operation of the machines were obtained and paid for by the Gem State Club or other locations where they were placed. Spiesman spent about 3½ hours each day in the management of Spiesman & Sons' affairs. He was also manager of the Gem State Club, for which he received a salary of $6,000 in 1951 and $7,500 in 1952, and spent 6 to 7 hours each day in its management. Capital is a material income-producing factor of the Spiesman & Sons partnership. The salary paid Spiesman for managing the affairs of the partnership is reasonable.

Spiesman had been appointed guardian of the estates of his four minor sons, Michael Joseph, Philip James, Leonard John, and Mathew James, III, by the Probate Court of Benewah County, Idaho, on April 17, 1947. He was appointed guardian of the Estate of Francis Edward by the same court on October 13, 1953.

No opening or annual inventory and accounting reports of the estates of any of the minor children, as required by sections 15–1825 and 15–1826 of the Idaho Code (1948), were filed by Spiesman as guardian during any of the years 1947 to 1952, inclusive; nor was there any supervision of the guardianship accounts otherwise exercised by the Probate Court during that period. On October 23, 1953, after the initiation of the investigation of petitioners' income tax returns for the years involved, Spiesman as guardian filed annual inventory and accounting reports of the estates of four of his sons, Mathew James, III, Philip James, Michael Joseph, and Leonard John, for each of the years 1947 to 1952, inclusive. These reports were approved, allowed, and settled by order of the Probate Court dated November 12, 1953. As he had not, prior to October 13, 1953, been appointed guardian of Francis Edward, no inventory or accounting report of the Estate of Francis Edward was filed at that time. Annual inventory and accounting reports of the estates of all five of the children for the years 1953, 1954, and 1955 were filed in 1954, 1955, and 1956, respectively.

Withdrawals from the Spiesman & Sons partnership on behalf of each of the five minor children, during the year 1952, were made by Spiesman. According to the inventory and accounting reports filed by Spiesman as guardian of the estates of his minor children, the following amounts were withdrawn from Spiesman & Sons on their behalf, respectively, during the years 1952 to 1955, inclusive:

|  | 1952 | 1953 | 1954 | 1955 |
| --- | --- | --- | --- | --- |
| Mathew James | $5,690.16 | $3,124.20 | $270.73 | (2) |
| Philip James | 1,592.80 | 3,557.13 | 2,005.33 | (2) |
| Michael Joseph | 1,593.25 | 3,626.12 | 1,936.62 | (2) |
| Francis Edward | (1) | 3,079.35 | 291.94 | (2) |
| Leonard John | 3,848.01 | 3,500.16 | 269.85 | (2) |

[1] Not shown.
[2] None.

Separate savings accounts for each of the minor children were opened in the Farmers & Merchants Bank of Rockford, Rockford, Washington, on March 17, 1952. Some of the funds withdrawn from the partnership on behalf of the children were deposited in their respective savings accounts; some were used to pay premiums on their individual life insurance policies; some were used to pay their income taxes; and occasionally some were used to purchase additional securities for them. None of these funds, insofar as the accounting reports filed with the Probate Court reveal, were used for the support or living expenses of any of the minor children.

On their income tax return for 1952, petitioners reported the sum of $17,077.25 as partnership income, of which $16,940.61 was received from Spiesman & Sons, and $136.64 from Spiesman and Resor.

The five minor children of petitioners were not the owners of capital interests in the partnership and were not bona fide partners in the Spiesman & Sons partnership during the years 1951 and 1952.

OPINION.

This is a family partnership case involving the question whether the five minor children of the petitioners were bona fide partners in the Spiesman & Sons partnership during the taxable years 1951 and 1952, within the meaning of sections 191 and 3797 (a) (2) of the Internal Revenue Code of 1939, as amended by section 340 (a) and (b) of the Revenue Act of 1951. Respondent has determined that they were not and accordingly included in petitioners' distributive share of the partnership income the amounts of $1,807.95 for 1951 and $24,234.25 for 1952, being the aggregate of the amounts shown on the partnership returns as distributable to the children. Petitioners contend that the children were bona fide partners having a one-ninth interest each, and that the above amounts were properly includible in the income of the children during said years.

Section 340 (a) of the Revenue Act of 1951, amended section 3797 (a) (2) of the Internal Revenue Code of 1939, which defines the terms partnership and partners, by adding thereto the sentence, "A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not said interest was derived by purchase or gift from any other person." Section 340 (b) of the Revenue Act of 1951 also amended the 1939 Code by adding thereto section 191, which provides:

SEC. 191. FAMILY PARTNERSHIPS.

In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service. For the purpose of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital. The "family" of any individual shall include only his spouse, ancestors, and lineal descendants, and any trust for the primary benefit of such persons.

These amendments, applicable to the years involved, were primarily for the purpose of clarification which the congressional committees deemed necessary to make clear the fundamental principle that, where there is a real transfer of ownership, a gift of a family part-

nership interest is to be respected for tax purposes without regard to the motives which activated the transfer, at the same time providing specific safeguards against the use of the partnership device to accomplish the deflection of income from the real owner.

The reports of the House Committee on Ways and Means (H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C. B. 357, 380-381) and of the Senate Committee on Finance (S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C. B. 458, 485-487) state that the amendment relating to family partnerships is intended—

to harmonize the rules governing interests in the so-called family partnership with those generally applicable to other forms of property or business. Two principles governing attribution of income have long been accepted as basic: (1) income from property is attributable to the owner of the property; (2) income from personal services is attributable to the person rendering the services. There is no reason for applying different principles to partnership income. If an individual makes a bona fide gift of real estate, or of a share of corporate stock, the rent or dividend income is taxable to the donee. Your committee's amendment makes it clear that, however the owner of a partnership interest may have acquired such interest, the income is taxable to the owner, if he is the real owner. If the ownership is real, it does not matter what motivated the transfer to him or whether the business benefited from the entrance of the new partner.

The reports point out, however, that—

The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham. Other cases will arise where the transferor retains so many of the incidents of ownership that he will continue to be recognized as a substantial owner of the interest which he purports to have given away, as was held by the Supreme Court in an analogous trust situation involved in the case of *Helvering* v. *Clifford* (309 U. S. 351). The same standards apply in determining the bona fides of alleged family partnerships as in determining the bona fides of other transactions between family members. Transactions between persons in a close family group, whether or not involving partnership interests, afford much opportunity for deception and should be subject to close scrutiny. All the facts and circumstances at the time of the purported gift and during the periods preceding and following it may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale.

Not every restriction upon the complete and unfettered control by the donee of the property donated will be indicative of sham in the transaction. Contractual restrictions may be of the character incident to the normal relationships among partners. Substantial powers may be retained by the transferor as a managing partner or in any other fiduciary capacity which, when considered in the light of all the circumstances, will not indicate any lack of true ownership in the transferee. In weighing the effect of a retention of any power upon the bona fides of a purported gift or sale, a power exercisable for the benefit of others must be distinguished from a power vested in the transferor for his own benefit.

\*        \*        \*        \*        \*        \*        \*

Therefore the bill provides that in the case of any partnership interest created by gift the allocation of income according to the terms of the partnership agreement shall be controlling for income tax purposes except when the shares are allocated without proper allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the allocation to the donated capital is proportionately greater than that attributable to the donor's capital. In such cases a reasonable allowance will be made for the services rendered by the partners, and the balance of the income will be allocated according to the amount of capital which the several partners have invested.  * * *

Respondent argues that the five minor children of petitioners were not bona fide owners of capital interests in the partnership during the years 1951 and 1952 for the reasons that there was no accounting to or supervision by the Probate Court of the guardianship estates during these years, and, under the licensing provisions of the Idaho statute, the children could not be treated as the real owners of a capital interest in the slot machines.   Respondent further argues that the participation of the minor children in the slot machine business was illegal in Idaho and, therefore, they should not be recognized as the real owners of a capital interest in the partnership business.

The proper accounting for a ward's estate by a fiduciary is primarily a matter for the State court to determine.   In view of our conclusions hereinafter discussed, we need not, and do not, here determine whether the filing by a fiduciary of such accountings and reports as are required by State law is a necessary condition of the recognition of a minor as a member of a partnership.   Section 29.191–1 of Regulations 111, as carried forward into section 39.191–1 of Regulations 118, referred to by respondent, was not promulgated until August 18, 1953.   See T. D. 6037, 1953–2 C. B. 213.   We have no doubt, however, that the filing or failure to file such accountings and reports may be considered, as a fact and circumstance following the purported gift, in determining the bona fides or lack of bona fides of a purported gift or sale, and we have done so in our determination.

With respect to the legality of the transaction, section 50–1503 of the Idaho Code (Session Laws 1947, ch. 151), later declared unconstitutional and repealed,[3] provided that it should be lawful for any person to own and operate coin-operated amusement devices within the limits of any incorporated city or village *only*, and *after* having first procured a license as thereinafter provided.   Section 50–1504 provided that no coin-operated amusement device might be operated on any premises except those owned or leased by the licensee, and, further, that no person other than the licensee "may have any legal, equitable or financial, title or interest in such device, whether by ownership, mortgage, conditional sales contract, or otherwise, nor receive any rent or remuneration therefrom or from the operation thereof."   It is also

---

[3] See footnotes 1 and 2, *supra*.

to be noted that section 50–1509 made it unlawful to "possess or permit operation" of such devices without license having first been procured as therein provided.

The machines here in question were operated on the premises of the Gem State Club, or other locations, not shown to have been owned or leased by petitioners, the partnership, or any of the parties to the Spiesman & Sons partnership agreement. All licenses were obtained and paid for by the Gem State Club or other locations. It is clear therefore that even if the Idaho statute under which they purported to act had not been declared unconstitutional and repealed, the minor children of petitioners cannot be considered as having any "legal, equitable or financial, title or interest" in such devices and that they could not legally "receive any rent or remuneration" from the operation of such devices.

Both Spiesman and his father testified that the reason for the purported gifts to the children was for the purpose of making them partners in the business of the Spiesman & Sons partnership. In *E. C. Ellery*, 4 T. C. 407, we held that since the gifts in that case were expressly or impliedly conditioned on the formation of a partnership which could not be formed because of the illegality of its business under the State law, the gifts failed at the outset. The same rule applies here.

Aside from the foregoing, however, we think it clear that there were no bona fide gifts of interests in the machines, which were the income-producing assets of the partnership, to the children, and the formation of the Spiesman & Sons partnership was a sham. The partnership agreement (petitioners' Exhibit 10) recited that "[a]t the time of this agreement, the assets to be taken over by the partnership are in possession and owned by the partner, Mathew James Spiesman, Jr., and are in the value of $2,374.63." The original typewritten agreement, after the initiation of the investigation of petitioners' income tax returns involved herein, was interlined to indicate that Spiesman and his father each owned a half interest in such assets at the time of this agreement. Whether such assets were owned by one or both is immaterial, so far as the children are concerned. Petitioners claim that each of the children received a one-ninth interest in such assets upon the execution of the partnership agreement and therefore was entitled to receive one-ninth of the distributable income. The facts shown do not support this contention.

The partnership agreement itself is, to say the least, inconclusive with respect to the transfer of title to the machines. It does not appear that there were any other written transfers of title and the books and records of the partnership were not placed in evidence. It appears, however, from the partnership return (Form 1065) filed

by Spiesman & Sons for the period beginning December 1, 1951, and ending January 1, 1952, as well as the return for the year 1952, that the full value of the machines was shown as included in the capital account of the petitioner, and no interest in such machines was included in the capital account of any of the children.

Moreover, the partnership returns show that withdrawals on behalf of the children were not equal for the year 1952, as they should have been if the children each owned a one-ninth interest in the capital assets. The unequal treatment of the children with respect to withdrawals from the partnership is likewise shown by the accounting reports filed by Spiesman as guardian for 1952, 1953, and 1954. In some instances the amount withdrawn was in excess of the purported distributable share of the child, and in other instances it was less. Spiesman explained such discrepancies as follows:

the difference in the amount of money withdrawn was due to the fact that Joe, the oldest boy, and Phil, the next oldest boy, had income from dividend stocks prior to the, and more stock, than the other children, and I tried to even up—at that time I tried to even up the cash account of each child, so that if I had an accident, why, or I got killed or died, my youngest child wouldn't say, "Well my dad wasn't very fond of me, he didn't leave me anything," and I didn't want to have that happen and I wanted them to be even as far as cash was concerned, and then they would eventually receive stock or whatever my dad was going to leave them when he died. But the cash account I tried to even up.

However commendable such treatment of his children by a father may be, the fact remains that it did not conform to the purported partnership interests of the children, or to his duties as a guardian if such partnership interests were bona fide; it was the action of a parent who owned, controlled, and distributed his own funds according to his own desires and ideas.

The question to be determined herein is one of fact to be determined from all the facts and circumstances. As stated in the reports of the Senate and House Committees, *supra,* "All the facts and circumstances at the time of the purported gift and during the periods preceding and following it may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale." See also *Commissioner* v. *Culbertson,* 337 U. S. 733, wherein the Supreme Court said that the question whether a partnership exists for income tax purposes is—

whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *

Considering all the facts and circumstances herein we hold that the five minor children of the petitioners were not the real owners of capital interests in the partnership and were not bona fide partners in the Spiesman & Sons partnership during the taxable years 1951 and 1952.

Inasmuch as respondent has abandoned his determination that the petitioners are liable for additions to tax for the years involved under section 294 (d) (2) of the Internal Revenue Code of 1939,

> *Decision will be entered finding petitioners liable for deficiencies in income tax in the amount of $2,155.22 for the year 1951, and in the amount of $14,056.20 for the year 1952.*

Reviewed by the Court.