LEO A. WOODBURY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4352–65—4354–65.    Filed December 12, 1967.

*Dale Forbes* and *M. O. Wordal*, for the petitioners.
*Lee A. Kamp*, for the respondent.

---

[1] Consolidated herewith are Glenn A. Woodbury and Pearl Woodbury, docket No. 4353–65 ; and Leo A. Woodbury and Anita L. Woodbury, docket No. 4354–65.

OPINION

*Issue 1.—Reallocation of Partnership Income*

Petitioners assert that they intended to create a partnership in which Glenn and Leo would be equal partners; that Glenn gave Leo a one-half interest in the partnership assets and liabilities in accordance with this intent; and that the partnership was actually operated with Glenn and Leo as equal partners. While the respondent agrees that Glenn and Leo formed a family partnership, he contends that the equal distribution of partnership gains and losses by the partners is inconsistent with the applicable statute and regulations. Section 704(e)[4] and the regulations thereunder provide that where a disproportionate allocation of partnership income exists, the Commissioner is to allow a reasonable amount for the services rendered by each partner and divide the balance between the partners in accordance with their capital interests. After allowing a sum for the partners' services in each of the years in question, respondent contends that Glenn had a 97.2-percent taxable distributive share of the partnership income while Leo had a 2.8-percent taxable distributive share.

Respondent concedes that the petitioners formed a valid partnership on January 1, 1957, and that Leo contributed 2.8 percent of the partnership capital in the form of livestock which he had owned prior to that date. Therefore, it is clear that Leo was a partner as of that date within the meaning of section 704(e)(1) without regard to Glenn's alleged gift to him of a substantial portion of the partnership assets.

---

[4] SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(e) FAMILY PARTNERSHIPS.—

(1) RECOGNITION OF INTEREST CREATED BY PURCHASING OR GIFT.—A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

(2) DISTRIBUTIVE SHARE OF DONEE INCLUDIBLE IN GROSS INCOME.—In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service.

Section 1.704–1(e)(1)(iv), Income Tax Regs.,[5] sets forth guidelines as to whether capital is a material income-producing factor in a partnership. The Woodbury partnership was in the ranching and farming business, and the capital contributions to it consisted of ranch land, farm machinery, and cattle. Without belittling the valuable services contributed by Glenn and Leo to the partnership, the quality of the land, the efficiency of the machinery, and the development of the cattle were critical to its success. Thus we think the capital contributed to this partnership was "a material income-producing factor" within the intendment of section 704(e)(1). It therefore becomes necessary to determine whether Leo received a bona fide gift of certain partnership assets and liabilities in order to ascertain, under section 704(e)(2), whether his alleged distributive share of income under the partnership agreement was "proportionately greater than the share of the donor [Glenn] attributable to the donor's capital."

Section 1.704–1(e)(2), Income Tax Regs.,[6] sets out guidelines for determining whether a donee of a capital interest in a partnership is the real owner of that interest. The regulation provides that the execution of legally sufficient deeds of gift under State law is a factor to be taken into account but is not determinative of ownership for purposes of section 704(e). The regulation then enumerates several other factors to be considered. We view this to mean that while proof of compliance with State gift law requirements is not determinative as to the *validity* of the gift for the purposes of section 704(e), such test must be met before this Court can consider other facts and circumstances.

Section 340(b) of the Revenue Act of 1951 amended the 1939 Code by adding thereto section 191 [sec. 704(e)(2) and (3) of the 1954 Code]. The reports of the House Committee on Ways and Means (H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 357, 380–381), and of the Senate Finance Committee (S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 485–487) state that the intention of Congress is—

to harmonize the rules governing interests in the so-called family partnership with those generally applicable to other forms of property or business. * * * Your

---

[5] Sec. 1.704–1(e) *Family partnerships*—(1) *In general*— * * *

(iv) *Capital as a material income-producing factor.* For purposes of section 704(e)(1), the determination as to whether capital is a material income-producing factor must be made by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business conducted by the partnership. In general, capital is not a material income-producing factor where the income of the business consists principally of fees, commissions, or other compensation for personal services performed by members or employees of the partnership. On the other hand, capital is ordinarily a material income-producing factor if the operation of the business requires substantial inventories or a substantial investment in plant, machinery, or other equipment.

[6] Sec. 1.704–1(e)(2) *Basic tests as to ownership*—(i) *In general.* Whether an alleged partner who is a donee of a capital interest in a partnership is the real owner of such

committee's amendment makes it clear that, however the owner of a partnership interest may have acquired such interest, the income is taxable to the owner, if he is the real owner. If the ownership is real, it does not matter what motivated the transfer to him or whether the business benefited from the entrance of the new partner.

## The Committee reports further provide:

The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham. Other cases will arise where the transferor retains so many of the incidents of ownership that he will continue to be recog-

capital interest, and whether the donee has dominion and control over such interest, must be ascertained from all the facts and circumstances of the particular case. Isolated facts are not determinative; the reality of the donee's ownership is to be determined in the light of the transaction as a whole. The execution of legally sufficient and irrevocable deeds or other instruments of gift under State law is a factor to be taken into account but is not determinative of ownership by the donee for the purposes of section 704(e). The reality of the transfer and of the donee's ownership of the property attributed to him are to be ascertained from the conduct of the parties with respect to the alleged gift and not by any mechanical or formal test. Some of the more important factors to be considered in determining whether the donee has acquired ownership of the capital interest in a partnership are indicated in subdivisions (ii) to (x), inclusive, of this subparagraph.

(ii) *Retained controls.* The donor may have retained such controls of the interest which he has purported to transfer to the donee that the donor should be treated as remaining the substantial owner of the interest. Controls of particular significance include, for example, the following:

(a) Retention of control of the distribution of amounts of income or restrictions on the distributions of amounts of income (other than amounts retained in the partnership annually with the consent of the partners, including the donee partner, for the reasonable needs of the business). If there is a partnership agreement providing for a managing partner or partners, then amounts of income may be retained in the partnership without the acquiescence of all the partners if such amounts are retained for the reasonable needs of the business.

(b) Limitation of the right of the donee to liquidate or sell his interest in the partnership at his discretion without financial detriment.

(c) Retention of control of assets essential to the business (for example, through retention of assets leased to the alleged partnership).

(d) Retention of management powers inconsistent with normal relationships among partners. Retention by the donor of control of business management or of voting control, such as is common in ordinary business relationships, is not by itself to be considered as inconsistent with normal relationships among partners, provided the donee is free to liquidate his interest at his discretion without financial detriment. The donee shall not be considered free to liquidate his interest unless, considering all the facts, it is evident that the donee is independent of the donor and has such maturity and understanding of his rights as to be capable of deciding to exercise, and capable of exercising, his right to withdraw his capital interest from the partnership.

The existence of some of the indicated controls, though amounting to less than substantial ownership retained by the donor, may be considered along with other facts and circumstances as tending to show the lack of reality of the partnership interest of the donee.

(iii) *Indirect controls.* Controls inconsistent with ownership by the donee may be exercised indirectly as well as directly, for example, through a separate business organization, estate, trust, individual, or other partnership. Where such indirect controls exist, the reality of the donee's interest will be determined as if such controls were exercisable directly.

(iv) *Participation in management.* Substantial participation by the donee in the control and management of the business (including participation in the major policy decisions affecting the business) is strong evidence of a donee partner's exercise of dominion and

nized as a substantial owner of the interest which he purports to have given away, as was held by the Supreme Court in an analogous trust situation involved in the case of *Helvering* v. *Clifford* (309 U.S. 351). The same standards apply in determining the bona fides of alleged family partnerships as in determining the bona fides of other transactions between family members. Transactions between persons in a close family group, whether or not involving partnership interests, afford much opportunity for deception and should be subject to close scrutiny. All the facts and circumstances at the time of the purported gift and during the periods preceding and following it may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale.

In 1952 the Commissioner stated his position concerning taxability of family partnerships for years prior to 1951.[7] The Commissioner's mimeograph is an elaboration of the statutory approach to family partnerships in the Revenue Act of 1951. See *Stanback* v. *Commissioner*, 271 F. 2d 514 (C.A. 4, 1959). In it the Commissioner says:

(b) *Documentation Not Controlling.*—The execution of legally sufficient and irrevocable deeds or other instruments of gift may, under State law, be essential to the validity of an alleged gift but is, of course, of less ultimate significance than the conduct of the parties after the gift has been made. Reality and good faith are not ascertainable by any mechanical or formalistic test.

We believe that these statements reveal an intent, on the part of Congress, that there must be a valid gift for State law purposes before there can be an examination of the surrounding facts and circumstances to determine whether the "purported gift" trans-

control over his interest. Such participation presupposes sufficient maturity and experience on the part of the donee to deal with the business problems of the partnership.

(v) *Income distributions.* The actual distribution to a donee partner of the entire amount or a major portion of his distributive share of the business income for the sole benefit and use of the donee is substantial evidence of the reality of the donee's interest, provided the donor has not retained controls inconsistent with real ownership by the donee. Amounts distributed are not considered to be used for the donee's sole benefit if, for example, they are deposited, loaned, or invested in such manner that the donor controls or can control the use or enjoyment of such funds.

(vi) *Conduct of partnership business.* In determining the reality of the donee's ownership of a capital interest in a partnership, consideration shall be given to whether the donee is actually treated as a partner in the operation of the business. Whether or not the donee has been held out publicly as a partner in the conduct of the business, in relations with customers, or with creditors or other sources of financing, is of primary significance. Other factors of significance in this connection include :

(a) Compliance with local partnership, fictitious names, and business registration statutes.

(b) Control of business bank accounts.

(c) Recognition of the donee's rights in distributions of partnership property and profits.

(d) Recognition of the donee's interest in insurance policies, leases, and other business contracts and in litigation affecting business.

(e) The existence of written agreements, records, or memoranda, contemporaneous with the taxable year or years concerned, establishing the nature of the partnership ageement and the rights and liabilities of the respective partners.

(f) Filing of partnership tax returns as required by law.

However, despite formal compliance with the above factors, other circumstances may indicate that the donor has retained substantial ownership of the interest purportedly transferred to the donee.

[7] See Mim. 6767, 1952–1 C.B. 111.

ferred *real ownership*. Indeed, no cases have been brought to our attention in which a family gift for partnership purposes was upheld where there was no gift under applicable State law. Cf. *Spiesman* v. *Commissioner*, 260 F. 2d 940 (C.A. 9, 1958), affirming 28 T.C. 567 (1957). Hence we feel compelled to determine whether there was a gift of the real property and personalty from Glenn to Leo on the date the partnership was formed.

Neither on January 1, 1957, nor at any time during the years here involved, did Glenn transfer title to any ranch land to Leo. Deeds to the various ranch land purportedly held by the partnership were always in the names of Glenn and Pearl. Yet applicable Montana law provides that: "An estate in real property * * * can be transferred only by operation of law, or by an instrument in writing subscribed by the party disposing of the same." [8] Here there was no transfer by operation of law, such as a constructive trust. Cf. *Opp.* v. *Boggs*, 121 Mont. 131, 193 P. 2d 379 (1948). And the petitioners have offered no evidence of a gift of one-half of the real property beyond a declaration of their intent to make such a gift and an alleged oral agreement to that effect. This is insufficient proof to justify our finding that there was a gift of one-half of the Jannsen or Porche ranch land from Glenn to Leo on January 1, 1957, or at any subsequent time during the years in question.

Turning to the alleged gift of cattle and farm machinery from Glenn to Leo, we find that the relevant Montana statutes provide:

A gift is a transfer of personal property made voluntarily, and without consideration. [Mont. Rev. Codes Ann. sec. 67–1706.]

A verbal gift is not valid unless the means of obtaining possession and control of the thing are given, nor, if it is capable of delivery, unless there is an actual or symbolical delivery of the thing to the donee. [Mont. Rev. Codes Ann. sec. 67–1707.]

In view of these statutory provisions, we hold that under Montana law Glenn made a valid gift to Leo of one-half the partnership cattle and farm machinery on the date the partnership was created. By participating in the partnership management, Leo obtained both possession and control of the personal property, such possession being the result of actual delivery. Cf. *Marans* v. *Newland*, 141 Mont. 32, 374 P. 2d 721 (1962); and *In Re Brown's Estate*, 122 Mont. 451, 206 P. 2d 816 (1949).

There still remains, however, the question of whether Leo meets the ownership requirements of section 704(e) and the regulations.[9] Applying the criteria contained in the regulations, it is clear that

---

[8] Mont. Rev. Codes Ann. sec. 67–1601.

[9] Sec. 1.704–1(e)(2), Income Tax Regs., fn. 6 *supra*, emphasizes factors in determining whether the donee has acquired ownership of the capital interest in the partnership.

Leo received a valid gift of one-half the partnership personalty and related liabilities. Glenn purported to make a gift of one-half the partnership cattle and machinery. Leo and Glenn exercised equal control over these assets in terms of distribution of income, liquidation of partnership assets, and management powers. They participated equally in the management of the partnership. Leo received actual distribution, for his sole benefit and use, of at least his distributive share of the partnership income. Likewise, with relatively few inconsistencies, Leo was held out to the public as an equal partner. Nor is section 1.704–1(e)(2)(viii), Income Tax Regs.,[10] pertaining to the partnership interest of minor children relevant since the evidence shows that Leo was competent to manage his own property and participated in partnership activites in accordance with his interest in the property.

Respondent determined that Glenn's services to the partnership were worth $5,000 in the years 1958 and 1959 and $6,000 for 1960, whereas Leo's services were worth $3,000 for the years 1958 and 1959 and $4,000 for 1960. As indicated by our findings of fact, we think the services of each partner should be valued at $5,000 for the years 1958 and 1959 and at $6,000 for the year 1960 for purposes of the section 704(e)(2) computation of income. This reflects our belief that Leo made a contribution equal to Glenn's in terms of services rendered to the partnership.

Accordingly, we hold that the distributive shares of partnership income for the years in issue should be reallocated to Glenn and Leo on the basis of their services and capital interests, as follows: First, to services in the amount of $5,000 by each partner in both 1958 and 1959, and to services of $6,000 by each partner in 1960. Second, as to the remaining partnership income, their capital interests are: The real property and related liabilities as of January 1, 1957, are attributable solely to Glenn; and all other partnership assets and liabilities (cattle and farm machinery) as of January 1, 1957, are attributable to Glenn and Leo in equal shares. The exact amounts of reallocated income can be determined in the Rule 50 computations.

[10] Sec. 1.704–1(e). Family partnerships— * * *

(2) Basic tests as to ownership— * * *

(viii) *Interests (not held in trust) of minor children.* Except where a minor child is shown to be competent to manage his own property and participate in the partnership activities in accordance with his interest in the property, a minor child generally will not be recognized as a member of a partnership unless control of the property is exercised by another person as fiduciary for the sole benefit of the child, and unless there is such judicial supervision of the conduct of the fiduciary as is required by law. The use of the child's property or income for support for which a parent is legally responsible will be considered a use for the parent's benefit. "Judicial supervision of the conduct of the fiduciary" includes filing of such accountings and reports as are required by law of the fiduciary who participates in the affairs of the partnership on behalf of the minor. A minor child will be considered as competent to manage his own property if he actually has sufficient maturity and experience to be treated by disinterested persons as competent to enter business dealings and otherwise to conduct his affairs on a basis of equality with adult persons, notwithstanding legal disabilities of the minor under State law.

*Issue 2.—Constructive Receipt of Income From the Sale of Cattle*

The regulations relating to the constructive receipt of income provide as follows:

Sec. 1.451–2. Constructive receipt of income.

(a) *General Rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

Petitioners contend that while the cattle sold by them were delivered to Bill Wilson in 1958, Wilson purchased a certificate of deposit payable to them in 1959, the money was not available until 1959, and the sale was conditioned on the handling of the transaction in such manner. Hence they maintain that the funds from the sale of the cattle were not constructively received during the year 1958. Taking the contrary view, respondent contends that the sales proceeds were subject to Glenn's unfettered control as of November 1958 and, therefore, they were constructively received at that time.

We agree with the respondent. Wilson took clear title to the cattle in early November 1958 and sold them at auction prior to November 7 of that year. He then made out a check payable to the Farmers State Bank where Glenn had a regular account. In his deposition Wilson said that he placed no restrictions on the check and knew of no arrangement whereby the partnership was not to receive such funds from the bank until 1959. The check cleared Wilson's account with the drawee bank on November 10, 1958.

On these facts it is plain that Glenn had unfettered control of the money as of November 1958. Although the bank issued to Glenn a certificate of deposit which was not payable until January 1, 1959, this method of handling the transaction was without Wilson's knowledge. His understanding of the agreement was simply that he deposit the funds with the Farmers State Bank. As we see it, the arrangement whereby Glenn could not reach the funds until 1959 was made at his own behest with the bank serving as his agent. At the critical point in time, namely when Wilson paid the check to the bank, Glenn, through the bank, had complete control over the flow of the funds. See *United States* v. *Pfister*, 205 F. 2d 538 (C.A. 8, 1953).

Petitioner relies heavily on *J. D. Amend*, 13 T.C. 178 (1949), and Rev. Rul. 58–162, 1958–1 C.B. 234, for the proposition that where limitations upon the receipt of income are an integral part of the agreement between the parties and the seller does not have an unqualified right to receive payment, the funds are not yet constructively received. Unlike those situations, there was no agreement here, either written

or oral, between Glenn and Wilson placing restrictions on Glenn's receipt of the funds in November 1958. Consequently, we regard those cases as inapposite. We hold that the funds from the sale of the cattle to Wilson were constructively received by the partnership during the year 1958. As such, they must be reported as income for that year and not in 1959.

### Issue 3.—Exchange of Cattle

With respect to this issue, the petitioners argue that the transaction in which they traded their cattle for Spencer Ranch cattle qualifies as an exchange of "like kind" property under the provisions of section 1031. They maintain that the contemporaneous negotiations for the sale of the Ruby Valley Ranch did not transform the nature of the cattle transfer to one of sale instead of exchange, and that the cattle involved in the exchange qualified as section 1031 "property held for productive use in trade or business." Respondent, on the other hand, argues that the multiparty, multistep transaction was a sale and subsequent repurchase of cattle which resulted in taxable gain with respect to the 225 cows and ordinary income with respect to the 425 mixed yearlings. First we must decide whether the cattle petitioners received from the Spencer Ranch were section 1031 property. Section 1031(a) provides that:

No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale * * *) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

In order for the exception to section 1031 to apply the only requirement is that the property received in exchange be "held primarily for sale." See *Ethel Black*, 35 T.C. 90 (1960).

In this particular transaction there is no doubt that the 225 cows with suckling calves which petitioners received from the Spencer Ranch were held for breeding purposes rather than for sale. With respect to the 425 mixed yearlings, the evidence discloses that Frank Spencer purchased yearlings from petitioners in years subsequent to the purported exchange and also sold other yearlings in petitioners' name to a packing company after feeding them for petitioners. Therefore, we have made a finding of fact that only 103 of the mix yearlings which petitioners received from the Spencer Ranch were held for breeding purposes, the remainder being held primarily for sale. As a result, only the 225 cows and 103 of the mixed yearlings qualified as section 1031 property.

The purpose of section 1031(a) is to defer recognition of gain or loss when a taxpayer makes a direct exchange of property with another party. The sale of property and simultaneous purchase of similar property does not constitute such an exchange. See *Coastal Termi-*

*nals, Inc.* v. *United States,* 320 F. 2d 333 (C.A. 4, 1963) ; and *John M. Rogers,* 44 T.C. 126 (1965), affirmed per curiam 377 F. 2d 534 (1967). Hence we must next decide whether this transaction was an exchange of petitioners' cattle for the Spencer Ranch cattle or whether petitioners sold their cattle to McCrea and made a subsequent repurchase of cattle from the Spencer Ranch.

McCrea tendered an offer for the Ruby Valley Ranch, including cattle, in March 1960. The escrow instructions dated March 22 which he signed were to that effect. While Glenn signed these escrow instructions, an accompanying letter to the title company requested that they not be delivered until the possibility of an exchange of ranches could be explored. Moreover, McCrea raised objections to outstanding mineral leases on the property. And Leo's name had to be included on the escrow instructions as a seller. From these facts we conclude that the original escrow instructions were merely an executory agreement, not a binding contract, under which petitioners would sell their cattle to McCrea. Indeed, based on the reservations which the petitioners and McCrea had to the March 22 escrow instructions, we doubt whether any agreement between them was ever reached. Cf. *Alderson v. Commissioner,* 317 F. 2d 790 (1963), reversing on other grounds 38 T.C. 215 (1962). Since petitioners began negotiations with Frank R. Spencer Ranch, Inc., for the exchange of ranches and cattle as early as March 30 and had discussed the advantages of such an exchange with their attorney as early as March 26, and since their agreement with Moore dated March 23 stated that his services would include either the sale or exchange of the ranch and cattle, we think the petitioners contemplated and intended the exchange of cattle from the very beginning of their discussions with McCrea. Cf. *Coastal Terminals, Inc.* v. *United States, supra;* and *Alderson* v. *Commissioner, supra.* .

Petitioners executed amended escrow instructions dated April 1, 1960, to incorporate the exchange of cattle with Frank R. Spencer Ranch, Inc., in the original escrow instructions. They also notified Title Company of such change and deposited a bill of sale for their cattle to be transferred to Frank R. Spencer Ranch, Inc., upon the closing of the escrow. Frank R. Spencer Ranch, Inc., also signed the amended escrow instructions and deposited for delivery to McCrea, upon the receipt of $103,750, a bill of sale for the cattle which were to be acquired from the petitioners. Consequently, it seems that an exchange was contemplated by the other parties as well as petitioners.

Petitioners never entered into a binding contract with McCrea for the sale of their cattle. They wanted to exchange cattle with the Spencer Ranch from the start of negotiations. The fact that the Spencer Ranch found a potential buyer for the Ruby Valley cattle prior to the actual exchange and that petitioners were active in finding the potential buyer do not alter the nature of the cattle exchange. McCrea

did not make a deposit on the purchase price by April 22, the final date for closing under the March 22 escrow instructions, and Elliott was not actually accepted as buyer of the Ruby Valley Ranch until May 4. Although the Spencer Ranch was reasonably certain that it had a purchaser for the Ruby Valley cattle, there was some risk that it had no buyer and would have to sell the cattle elsewhere. Moreover, the fact that a party obtains property on the understanding that the property can be disposed of elsewhere does not necessarily mean that he is merely acting as an agent for another or that his subsequent sale or exchange of the property has no substance by itself. See *Coastal Terminals, Inc.* v. *United States, supra; Alderson* v. *Commissioner, supra;* and *Mercantile Trust Co. of Baltimore, et al., Executors*, 32 B.T.A. 82 (1935). Here the petitioners intended to exchange cattle with the Spencer Ranch and the form is entirely consistent with their intent. Cf. *Gregory* v. *Helvering*, 293 U.S. 465 (1935).

Respondent maintains that the difference between a sale and an exchange is that in a sale the property is transferred in consideration of a concrete price expressed in terms of money, while in an exchange the property is transferred in return for other property without the intervention of money. He then notes that negotiations between petitioners and Spencer Ranch were at a set unit price of $225 per cow and $125 per yearling, and that Spencer purchased additional cows at $225 a head from Arlo Ellison to complete the transfer as agreed to by the parties. However, we find that price was the common denominator for describing the quality of the cattle to be exchanged rather than a means of ascertaining the sales price of petitioners' cattle. Cf. *J. H. Baird Publishing Co.*, 39 T.C. 608, 618 (1962).

Accordingly, we hold that the petitioners and Frank R. Spencer, Inc., made an exchange of cattle which, to the extent the cattle were not held primarily for sale, qualified for nonrecognition of gain under section 1031(a).

*Issue 4.—Additions to Tax Under Section 6653(a)*

Section 6653(a) provides that an addition to tax shall be imposed if any part of the underpayment of taxes is due to negligence or intentional disregard of rules and regulations. We do not need to discuss the argument of petitioners that the burden of proof on this issue falls on the respondent because we are persuaded, on these facts, that the underpayments in income tax were not due to any negligence or an intentional disregard of the rules and regulations on the part of the petitioners.

Section 1.6001-1(b), Income Tax Regs., provides that farmers [ranchers] need not keep the complete records required of other taxpayers. But they are required to keep "such records as will enable the district director to determine the correct amount of income subject to

the tax." The calendars, "farm file," checks, and receipts kept by petitioners were adequate records of their income. Petitioners' attorney testified that the records which they kept for the years 1958 and 1959 were better than those maintained by other farmers and ranchers in that area. He also testified that errors in reporting the 96 cattle and the 23 cattle were attributable entirely to him. In 1960, the records were kept on the double-entry system by a certified public accountant.

Petitioners consulted either an attorney or an accountant for the preparation of their income tax returns for the 3 years involved. Their reliance on attorneys or accountants indicates their good faith and evidences due care of their obligations under the income tax laws. In addition, the petitioners consulted attorneys or accountants or both for guidance and tax advice about every transaction before us. While it is true that some errors were made in the individual and partnership returns for the years 1958, 1959, and 1960, we believe that no part of the deficiency was due to petitioners' negligence or their intentional disregard of the rules and regulations. See *L. L. Moorman*, 26 T.C. 666 (1956); *Rhett W. Woody*, 19 T.C. 350 (1952); *Miller* v. *United States*, 211 F. Supp. 758 (D. Wyo. 1962); and *Spouting Rock Beach Corp.* v. *United States*, 176 F. Supp. 938 (D. R.I. 1959). We hold that the respondent erred in determining the additions to tax under section 6653(a).

To reflect the conclusions reached herein,

*Decisions will be entered under Rule 50.*