NELSON BROTHERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nelson Bros., Inc. v. Commissioner
Docket Nos. 34540-87, 20207-89.
United States Tax Court
T.C. Memo 1992-726; 1992 Tax Ct. Memo LEXIS 775; 64 T.C.M. (CCH) 1594; 16 Employee Benefits Cas. (BNA) 1437; December 28, 1992, Filed *775 Decision will be entered under Rule 155. For Petitioner: Robert C. Walthall and Francis Gerald Burnett. For Respondent: Robert W. West. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the fiscal years ended June 30 of 1982, 1983, 1984, and 1985 (hereinafter fiscal years 1982, 1983, 1984, and 1985) as follows: Fiscal
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1982
$   524,039.94
--
--  1983
187,914.17
--
--  1984
29,756.00
$  1,488 50% of interest
due on $ 29,756
1985
407,182.00
20,359 50% of interest
due on $ 407,182
$ 1,148,892.11
$ 21,847 The issues for decision are: (1) Whether petitioner is entitled to deduct in fiscal years 1982, 1983, 1984, and 1985 the payments made under a plan giving benefits to the surviving spouse of an officer of petitioner; (2) whether petitioner is entitled to deduct during fiscal years 1982, 1983, and 1984 commissions on sales to one of petitioner's main customers paid under a consignment agreement between petitioner and a partnership whose partners were companies owned by three of *776 the officers of petitioner; and (3) whether petitioner is liable for the additions to tax for negligence under section 6653(a)(1) and (2) [1] for fiscal years 1984 and 1985. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of filing its petition in this case, petitioner, an Alabama corporation, had its principal place of business in Parrish, Alabama. Petitioner filed its Federal income tax returns for its fiscal years 1982, 1983, 1984, and 1985 with the Internal Revenue Service Center in Atlanta, Georgia. Petitioner originated as a partnership (the partnership) created by William H. Nelson, Jr. (known as Dugan) and his brother Olen Nelson (Olen) in 1956. In 1964, the partnership was incorporated forming petitioner. At this time Dugan began to serve as president of petitioner *777 and continued in that position until his death. Initially, petitioner issued 100 shares of stock which were owned as follows: Name
Shares
William H. Nelson, Jr.
49
Jennie Ruth Nelson (Jennie Ruth)
1
Olen Nelson
49
Lucille Nelson
1
Total
100
Jennie Ruth was the wife of Dugan. In 1970, Dugan suffered a heart attack that caused him to be absent from work for a couple of months. Also in 1970, Randy Nelson (Randy), Dugan's second son, left school and began to work for petitioner. Originally, Dugan and Olen Nelson jointly ran petitioner. Dugan handled such things as sales and customer relations while Olen handled the administrative details. Around the middle of 1972, Dugan began to disagree with Olen about the direction petitioner's business should take. This led to petitioner's purchase of the stock held by Olen and Lucille Nelson, leaving the ownership of petitioner as follows: Name
Shares
William H. Nelson, Jr.
49
Jennie Ruth Nelson
1
Total
50
From this time and until his death, Dugan was the majority owner of petitioner, owning all but one share of petitioner's stock. Because of his ownership, Dugan was in complete control of petitioner and *778 had the final say on all decisions with respect to petitioner. Dugan was a hard worker and worked long hours. Dugan's workday began around 4:30 a.m. or 5 a.m. when petitioner's customers would call Dugan at home to place orders. Dugan was very involved in petitioner's relationship with its customers. In 1972, Bill Nelson (Bill), Dugan's eldest son, began to work for petitioner. Bill had obtained a degree in mechanical engineering from Auburn University in 1970 and had subsequently worked with Shell Oil Co. and Atlas Bradford. In 1976, Bill became executive vice president, marketing, and treasurer of petitioner, while Randy became executive vice president, administrative, and secretary. In 1977, Tony Nelson (Tony), Dugan's third son, joined petitioner and in 1978 became vice president, technical, sales, services and aviation. In April 1979, Dugan was diagnosed by Dr. Albert Tully as having renal cell carcinoma (a cancerous tumor) of the right kidney. On May 22, 1979, Dr. Tully operated on Dugan and removed his whole right kidney. Dr. Tully found no evidence that the cancer had metastasized. After the surgery, Dr. Tully told the family that the tumor was cancerous and he *779 had removed the whole kidney. Dr. Tully also informed the family that the prognosis for Dugan's recovery was good. While recovering from the surgery, Dugan had follow-up visits with Dr. Tully. At these visits, Dr. Tully performed tests to further check to see if the cancer had metastasized. In July 1979, Dugan attended Tony's wedding in Hawaii. Upon returning to Alabama, Dugan began once again to actively participate in the operations of petitioner. On September 12, 1979, Dugan had a liver scan which showed questionable lesions in the left lobe. This liver scan was due to be repeated but Dugan left for Brookwood Lodge. On December 6, 1979, petitioner engaged Robert C. Walthall, an attorney, and Richard Powell, a certified public accountant, to review and make recommendations as to petitioner's system of compensation. Mr. Powell discussed with Mr. Walthall the possibility of using a spousal income benefit plan, which Mr. Powell had used with other clients. Mr. Walthall approved of the idea of such a plan for petitioner. On December 26, 1979, Mr. Walthall and Mr. Powell presented their recommendations to Dugan. These recommendations included the Spousal Income Benefit Plan *780 and Agreement (Spousal Plan). Later that same day, a special joint meeting of the board of directors and stockholders of petitioner was held. At this meeting the board approved the Spousal Plan and it was executed. There was no discussion of Dugan's health at the board meeting. The board also declared a cash dividend of $ 300 per share, for a total dividend of $ 15,000. This was the first dividend that petitioner had declared. The declaration of the dividend was another recommendation of Mr. Walthall and Mr. Powell. The dividend was paid the day following its declaration. Mr. Powell had no knowledge of Dugan's health problems at the time he made his recommendation to petitioner. According to the Spousal Plan, its purpose was "to provide further benefits in recognition" of Dugan's services to petitioner. Under the Spousal Plan, if Dugan continued in the employment of petitioner until his death, petitioner would pay to Dugan's surviving spouse monthly an amount equal to 50 percent of the monthly salary of Dugan in effect at the date of his death. The payments were to continue until the death or remarriage of the surviving spouse or until certain other events happened. The *781 actuarial value of the benefits provided under the Spousal Plan at the time of grant was $ 440,476. Dugan was the only employee of petitioner covered by the Spousal Plan. On December 26, 1979, Dr. William E. Birdsong, Dugan's personal physician and a family friend, treated Dugan for an upper respiratory infection. At this time, Dr. Birdsong gave Dugan an injection of Bicillin, which is a type of penicillin. On January 1, 1980, Dugan and Bill, along with some of petitioner's customers, were in New Orleans to see the University of Alabama play the University of Arkansas in the 1980 Sugar Bowl. Prior to attending the game, Dugan came up to Bill in the hotel lobby and complained about his shoulder hurting. Bill recommended to Dugan that he skip the game, but Dugan would not do so. On January 2, 1980, after Dugan returned from New Orleans, Dr. Birdsong performed an x-ray on his chest. Based on the results of the x-ray, Dr. Birdsong referred Dugan back to Dr. Tully. On January 2, 1980, the Cunningham Pathology Associates made a test on Dugan on a reference from Dr. Tully. Under date of January 2, 1979, Dr. Tully stated in his records with respect to Dugan, that Dugan "wishes to *782 consider going to M. D. Anderson Hospital in Houston". On January 7, 1980, a liver and spleen scan was made. The next day, another chest x-ray was performed. On January 9, 1980, a perfusion lung scan and a computerized axial tomography (CAT) scan were performed. At this point, Dugan was sent to M. D. Anderson Hospital and Tumor Institute in Houston, Texas, for treatment. The treatment was not successful and on November 21, 1980, Dugan died. After Dugan's death, Bill became president and chief executive officer of petitioner. Bill had been acting as president of petitioner for a period of time prior to Dugan's death. At the time of his death, Dugan was survived by Jennie Ruth. As Dugan's surviving spouse, Jennie Ruth began to receive payments under the Spousal Plan during December 1980. Dugan's salary at the time of his death amounted to $ 30,000 per month, excluding bonuses which he might have otherwise received had his death not occurred. Pursuant to the Spousal Plan, during the fiscal year ended June 30, 1981, petitioner paid a total of $ 109,000 to Jennie Ruth. During each of the fiscal years ended June of 1982, 1983, 1984, and 1985, petitioner paid $ 15,000 per month *783 ($ 180,000 per annum) to Jennie Ruth pursuant to the Spousal Plan. In 1985, Bill and Tony began to discuss the possibility of petitioner's buying out the Spousal Plan with a note. One of the reasons for this discussion was that the amount of money being paid by petitioner under the Spousal Plan was a large amount and was putting a burden on petitioner. Also, the showing of the Spousal Plan on financial statements of petitioner caused users of the statements to require an explanation from petitioner's officers. On June 28, 1985, petitioner purchased the rights and interest of Jennie Ruth under the Spousal Plan and as consideration issued a promissory note of petitioner in the face amount of $ 787,000. Bill and Tony personally guaranteed the note. At the time petitioner purchased Jennie Ruth's interest in the Spousal Plan, Jennie Ruth was the majority shareholder of petitioner. Specifically, Jennie Ruth still owned the one share of petitioner's stock that she received in 1964, and she also owned 12.25 shares of petitioner's stock through a trust established by Dugan's will. Of the shares of petitioner that Dugan owned at his death, some had been redeemed by the company in order *784 to pay estate taxes, and the balance had been divided 50 percent to Jennie Ruth and 50 percent split among Bill, Randy, and Tony. When Dugan and Olen began the partnership, its business was that of a trucking company delivering ammonium nitrate to various coal companies in Alabama as an agent for Spencer Chemical Co. (Spencer). Spencer was subsequently acquired by Gulf Oil Chemical (Gulf), a competitor of petitioner. After about 2 years, the Nelson Brothers partnership became a warehousing agent for Monsanto industrial ammonium nitrate. As a warehouse agent for Monsanto, petitioner received a fee for unloading the ammonium nitrate, another fee for warehousing the ammonium nitrate, and a final fee for reloading the ammonium nitrate prior to delivery. Upon learning of the partnership's agreement with Monsanto, Spencer terminated its agency relationship with petitioner. Since its incorporation, petitioner has sold ANFO. ANFO is an industry name for any product that is composed of ammonium nitrate and fuel oil. ANFO is considered the simplest and cheapest form of explosive used in the mining industry. Petitioner manufactured ANFO. In the early 1960s, petitioner developed a rail *785 siding for its plant. Petitioner would purchase ammonium nitrate in 80-100 pound packages, empty these packages into a mixer, add a precise amount of diesel fuel, and package the finished product in various sized packages. Later, Monsanto developed a new plant process for explosive products and in 1964 built a plant on land leased from petitioner. Petitioner was employed by Monsanto as its exclusive sales agent for explosive products within Alabama. After about 1 year, Monsanto and petitioner terminated their agreement and became competitors in the explosive products business. ANFO is not water resistant. During the 1960s, petitioner developed a product that it called high-density ANFO (HD ANFO), which was one of the first ANFO products in the South that could be used in water. The HD ANFO had a very large profit margin and made up a large portion of petitioner's profits, even though it was not a large percentage of its gross sales. In the late 1960s, petitioner began to use bulk ANFO explosive products. Ammonium nitrate from a rail hopper car was mixed in a tank with fuel oil. The product was then loaded into a bulk delivery truck and delivered to the customer. Sometime *786 around 1979, Gulf developed a slurry explosive called NCN 600. A slurry explosive has a gelatinizing agent in it which causes it to not be hindered by water. NCN 600 was the first waterproof product that was cost competitive to the HD ANFO, costing only about 10 percent more. Gulf's new product was a concern to petitioner, so petitioner began to look for ways to compete with Gulf. At this point petitioner made a decision to go with emulsions because it was the belief of petitioner's officers that emulsions were the "wave of the future". In 1981, petitioner entered into a license agreement with Atlas Powder Co. (Atlas). Also in 1981, petitioner built a bulk emulsion plant in order to manufacture a new emulsion product that petitioner was developing with Atlas. The first product that was manufactured at the plant and sold to customers had problems with its shelf life. The problem with the shelf life was discovered in early 1982 when the product was being used by Drummond Coal Co. (Drummond) at one of its mines halfway between Birmingham and Jasper. Drummond, which has extensive coal mining operations in Alabama, is petitioner's main customer. Because of the problems with the *787 shelf life, the product failed to detonate properly. The failure of the product to properly detonate concerned officials of Drummond who told petitioner that Drummond would have to use NCN 600 until petitioner had developed a product that worked. After this, petitioner and Atlas began working on development of a product with a longer shelf life which would be competitive with NCN 600. Atlas had the laboratories for testing products and so it handled the testing aspects of the development process. Petitioner used its new plant to manufacture the new product and was also responsible for field testing the different blends of the product. Petitioner was willing to use whatever equipment and money were needed to accomplish its goal of a waterproof product. The work done by Atlas and petitioner led to the development of Power NEL and ANFO Plus. Power NEL is a slurry-emulsion explosive for which petitioner has a registered trademark. The shelf life of these new products began at about 4 months and at the time of the trial had been improved to retain its explosive properties for over 5 years. While the shelf life was still low, Bill, Tony, and Randy monitored where each load of the *788 new product was and when it had been manufactured so that the customer would not wait too long to use it. It was not until October 1984 that the shelf life problem was completely corrected. During 1983, petitioner decided to try to diversify and get into the computer information business. To facilitate this, Bill moved to Atlanta, Georgia, and began a division of petitioner called PC Info. Since Bill was in Atlanta, Randy became president of petitioner. PC Info was to publish newsletters which would provide personal computer owners information on possible business uses of their computers. When the attempt to enter this line of business failed, Bill moved back to Birmingham and returned to his position as president of petitioner. In October 1984, Randy resigned from his position with petitioner and had no further association with petitioner. His stock in petitioner was redeemed. The total salary and bonuses actually paid to the officers were as follows (not including consignment commissions paid to Nelson Sons, a partnership, and not including the value of the Spousal Plan granted): William H.
William H.
Randy
Tony
Jennie R.
Year
Nelson, Jr.
Nelson III
Nelson
Nelson
Nelson
1972
$ 60,800
$ 5,000
$ 5,000
$ 4,800
1973
73,500
42,125
42,125
4,800
1974
125,000
61,500
61,500
4,800
1975
195,600
95,600
95,600
4,800
1976
250,000
136,250
140,000
4,800
1977
250,000
140,000
140,000
4,800
1978
347,000
217,000
217,000
$ 55,231
5,200
1979
501,045
310,625
310,625
196,203
4,800
June 1980 [1]
140,000
95,000
95,000
51,667
2,400
June 1981
140,000
406,667
406,667
346,667
4,800
June 1982
220,000
220,000
170,000
4,800
June 1983
210,000
210,000
180,000
4,400
June 1984
224,000
224,000
196,000
4,800
June 1985
216,000
54,000
189,000
4,800
*789 Since the Spousal Plan was created in 1979, Dugan's total compensation for 1979 was $ 941,521 ($ 501,045 + $ 440,476). Petitioner's net worth, sales, gross profit, and net after-tax income, but without certain adjustments determined by respondent for the years ended December 31, 1971, to fiscal year ended June 30, 1985, are as follows: Stockholder
Gross
Net After-Tax
Year
Equity
Sales
Profit
Income
1971
$ 272,700 $ 2,010,233
$ 554,220
$ 62,481 1972
90,814 2,775,111
335,103
87,808 1973
221,327 3,132,364
501,481
129,763 1974
668,608 6,188,211
1,186,101
447,281 1975
1,319,462 11,510,754
2,035,169
650,854 1976
1,616,004 10,365,338
1,618,919
296,542 1977
1,827,832 10,536,878
1,723,002
211,828 1978
2,062,806 13,104,522
2,221,000
234,479 1979
2,845,955 17,251,411
3,253,654
834,149 June 1980
3,002,003 10,665,185
1,600,805
156,048 June 1981
1,443,387 17,857,678
2,463,010
(1,558,616)
June 1982
1,603,468 25,467,516
3,271,700
389,485 June 1983
1,198,597 22,656,028
2,670,741
(404,871)
June 1984
(454,277)
25,423,092
2,532,296
(1,104,237)
June 1985
(416,039)
27,854,717
3,098,802
1,886,438 *790 Prior to his death, Dugan consulted with Messrs. Powell and Walthall about developing a plan that would encourage Bill, Randy, and Tony to further develop the relationship that petitioner had with Drummond. As stated earlier, Drummond has a large coal mining operation in Alabama and is petitioner's main customer. At the time of Dugan's discussions with Messrs. Powell and Walthall, petitioner was receiving about 50 percent of Drummond's business. Mr. Powell recommended that petitioner enter into the Consignment Agreement with Nelson Sons, a partnership composed of three general partners who were Wilnelco, Inc., Rannelco, Inc., and Tonelco, Inc. Each of the partners had an equal interest in Nelson Sons. The capital stock of Wilnelco, Inc., was owned by Bill. The capital stock of Rannelco, Inc. was owned by Randy. The capital stock of Tonelco, Inc., was owned by Tony. Under the Consignment Agreement, a commission was paid to Nelson Sons on all sales made to Drummond equal to 4 percent of such sales. Nelson Sons had no employees, no physical assets, and no income other than the 4-percent commissions. Since each of the three Nelson brothers had an equal interest in Nelson Sons, *791 each of the three Nelson brothers effectively received a commission of 1-1/3 percent of the sales to Drummond. The following commissions were paid by petitioner to Nelson Sons under the Consignment Agreement: Year
Commissions
1982
$ 409,962.48
1983
420,543.56
1984
[1] 523,781.19
Around 1983, petitioner acquired 100 percent of Drummond's business and since that time, has continued to receive 100 percent of Drummond's business. The Consignment Agreement was terminated retroactively to July 1, 1984, at the June 25, 1985, joint meeting of petitioner's board of directors and shareholders. The publication entitled "Alabama Coal Data" is published annually by the Geological Survey of Alabama and contains information on coal production in Alabama. This publication reported the following: Calendar
Drummond
State of Alabama
Year
Surface
Surface
Underground
Total
1974
2,749,608
12,540,110
7,101,844
19,641,954
1975
3,322,567
14,789,888
7,632,105
22,421,993
1976
2,390,796
14,001,602
7,388,809
21,390,411
1977
3,110,289
14,638,655
6,580,964
21,219,619
1978
2,815,664
13,933,981
6,175,032
20,109,013
1979
3,689,109
15,799,869
8,190,705
23,990,574
1980
4,744,666
16,898,853
9,504,029
26,402,882
1981
4,203,928
15,912,486
8,640,203
24,552,689
1982
5,448,478
14,385,539
10,722,926
25,108,465
1983
5,696,893
12,596,402
10,472,000
23,068,402
1984
5,611,150
13,384,165
12,835,504
26,219,669
1985
5,197,697
13,102,531
13,879,491
26,982,022
*792 Drummond did not engage in underground mining during the years shown above. Respondent in her notice of deficiency for petitioner's fiscal years 1982 and 1983 disallowed petitioner's claimed Spousal Plan payment of $ 180,000 for each year and Consignment Agreement payments of $ 409,962.48 and $ 420,543.56, respectively. In this notice respondent also disallowed a deduction claimed in 1982 of $ 5,000 for salary paid to Jennie Ruth. Respondent in her notice of deficiency to petitioner for the years 1984 and 1985 disallowed petitioner's claimed deductions for Spousal Plan payments of $ 180,000 and $ 787,000, respectively, and disallowed the claimed deduction for Consignment Agreement payments for the fiscal year 1984 in the amount of $ 523,781.19. OPINION The first issue for decision is whether petitioner is entitled in each of the years here in issue to the deduction claimed with respect to petitioner's Spousal Plan. As is any deduction, this claimed deduction is proper under section 162 only if it is an ordinary and necessary business expense of petitioner. Petitioner claims that the Spousal Plan was an ordinary and necessary expense of petitioner as deferred compensation to *793 Dugan. We therefore must determine whether such deferred compensation to Dugan was an ordinary and necessary expense of petitioner. This involves a determination of whether the Spousal Plan served a business purpose of petitioner and whether the value of such plan added to Dugan's 1979 other compensation constituted reasonable compensation to Dugan for that year. An expense may be deemed to be ordinary even though it is unique to the taxpayer, if it is common to the taxpayer's business community. Welch v. Helvering, 290 U.S. 111, 114 (1933). Based on the number of cases dealing with payments to surviving spouses of executives, it appears that the payments from the Spousal Plan are ordinary.[2]
Necessary has been defined simply as appropriate and helpful. Welch v. Helvering, supra at 113. *794 Necessary does not mean that the expense is indispensable. Bennett's Travel Bureau, Inc. v. Commissioner, 29 T.C. 350, 359 (1957). Instead, the expense must be necessary in the sense that it is, at least, proper and helpful for the development of the taxpayer's business. Welch v. Helvering, supra at 113. Said another way, there needs to be a legitimate business purpose for the expense and some reasonable link must exist between the expense and the business purpose to be served. As we have stated before, it is sufficient if there are "reasonably evident business ends to be served, and the intention to serve them appears adequately from the record." B. Manischewitz Co. v. Commissioner, 10 T.C. 1139, 1145 (1948). Ordinarily, the deductibility of compensation paid by an employer to an employee is governed by section 162. [3] However, the deductibility of deferred compensation to an employee by an employer is governed by section 404. [4] In 1978 Congress amended section 404 and indicated that section 404 was applicable to any plan that deferred the receipt of compensation. H. Rept. 95-1445 *795 (1978), 1978-3 C.B. (Vol. 1) 181, 235; S. Rept. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 315, 371. Since the Spousal Plan is a deferred compensation plan, it comes within this "broad sweep" of section 404. See Albertson's, Inc. v. Commissioner, 95 T.C. 415, 428 (1990). Section 404 provides that such compensation must meet the requirements of section 162. See David R. Webb Co. v. Commissioner, 708 F.2d 1254, 1256 (7th Cir. 1983), affg. 77 T.C. 1134 (1981); sec. 1.404(a)-1(b), Income Tax Regs.
*796 There have been situations where payments under a plan similar to the Spousal Plan here in issue were held to be ordinary and necessary. In those instances, the plan was shown to serve some legitimate business purpose of the taxpayer. See Andrews Distributing Co., Inc. v. Commissioner, T.C. Memo. 1972-146; Ring Power Corp. v. United States, 63 AFTR 2d 89-878, 89-1 USTC par. 9109 (M.D. Fla. 1988). This record shows that Dugan had a respiratory problem on December 26, 1979, but nevertheless decided to go to New Orleans to the Sugar Bowl game which was played on January 1, 1980. On January 2, 1980, he had a chest x-ray by his personal physician and other tests directed by Dr. Tully, who was the doctor treating him for cancer. The record does not show whether arrangements for these tests had been made before Dugan left for New Orleans, but the inference from the number of tests performed on that day, and the fact that it was the day or day after he returned from New Orleans, is that the arrangements had been made. Based on the evidence in the record, we conclude that Dugan knew that he was seriously ill *797 and that he might die in the near future at the time of the adoption of the Spousal Plan. The Spousal Plan was adopted to provide income for Jennie Ruth after Dugan's death. Clearly here there was no legitimate business purpose for the payments from the Spousal Plan to Jennie Ruth unless the payments were based on reasonable compensation to Dugan. Since Dugan died before the end of 1980 and we have found that Dugan knew that he was seriously ill and might die in the near future at the time the Spousal Plan was adopted, the value of the Spousal Plan would have to be reasonable compensation for Dugan for 1979 or for 1979 and prior years. Neither party argues to the contrary. The record shows no basis for payments to Jennie Ruth other than as additional compensation to Dugan. Under section 162(a)(1), compensation is deductible only if it is an ordinary and necessary expense of a trade or business. Furthermore the amount of the compensation must be reasonable in relation to the services actually rendered. Sec. 1.162-7(a), Income Tax Regs. Therefore, the deductions for the payments would be allowable only if the value of the plan when added to Dugan's other compensation in 1979 *798 resulted in reasonable compensation to Dugan for that year. Petitioner contends that part of the Spousal Plan served the purpose of compensating Dugan for services rendered in prior years for which petitioner argues Dugan was not adequately compensated. Under some circumstances prior services may be compensated for in a later year. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930). However, in such cases, the taxpayer must establish that there was not sufficient compensation in the prior periods and that in fact the current year's compensation was to compensate for that underpayment. Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990) (citing Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. a Memorandum Opinion of this Court), affd. on another ground 965 F.2d 1038 (11th Cir. 1992). Petitioner has not made such a showing in this case. The provisions of the Spousal Plan indicate that the plan was set up to compensate Dugan for services Dugan would perform in the future, and not, as petitioner argues, for services Dugan *799 had already performed. [5]
Whether the amount of compensation paid by a corporation to an officer is reasonable depends on the facts and circumstances of the particular case. Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975); sec. 1.404(a)-1(b), Income Tax Regs. The case law has established no hard and fast rules but instead looks to a number of factors, such as: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities *800 of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the * * * [corporation] as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] The factors listed in Mayson Manufacturing Co. v. Commissioner, supra, have been adopted by this Court on numerous occasions. No one factor is determinative. Although a closely held corporation is entitled to deduct reasonable compensation for services actually rendered by an officer-shareholder, the payment of compensation to the officer-shareholder does warrant special scrutiny. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974), affg. T.C. Memo. 1973-130; *801 Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980); see also secs. 1.162-7(b)(1) and 1.162-8, Income Tax Regs. When determining the reasonableness of compensation, both the nondeferred and the deferred compensation is considered. Edwin's, Inc. v. United States, 501 F.2d 675, 679 (7th Cir. 1974); Charles E. Smith & Sons Co. v. Commissioner, 184 F.2d 1011, 1014 (6th Cir. 1950), affg. Smith v. Commissioner, 11 T.C. 174 (1948). In the present case, there is no doubt that Dugan rendered valuable services to petitioner. Dugan was a hard worker and as Bill testified, Dugan basically was the company. However, we conclude that when the amount of the Spousal Plan is considered as part of the compensation Dugan received in 1979, the amount of Dugan's 1979 compensation is unreasonable. Dugan's qualifications were that he had been in the explosives business for many years. The record reveals no special qualifications that Dugan had except for his experience. Dugan made the decisions for petitioner and worked many long hours. Dugan spent a great *802 deal of time with sales and customer relations. However, petitioner's growth can be traced in large part to the growth that Drummond experienced. Petitioner's sales in 1979 amounted to $ 17,251,411. Petitioner's business was not highly complicated. Its manufacturing process consisted of mixing two products together. Petitioner did provide some technical advice to its customers, but the record fails to show that to be a major area of petitioner's business or that it involved any high degree of expertise. We do not accept petitioner's argument that petitioner could be characterized as a service company. The record shows that the compensation paid by petitioner to Dugan in the years 1977, 1978, and 1979, without adding in the value of the Spousal Plan, constituted 2.4 percent, 2.6 percent, and 5.5 percent, respectively, of sales and 118.0 percent, 148.0 percent, and 112.8 percent, respectively, of net after-tax income. The latter is in most cases a better indicator of whether the corporation is disguising dividends as compensation. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 (5th Cir. 1987), affg. T.C. Memo. 1985-267. *803 Coal production in Alabama increased by 3,811,561 tons or 19.3 percent between 1978 and 1979. Drummond increased its production during this time by 873,445 tons or 31.0 percent. In 1979, petitioner experienced an increase in sales of $ 4,146,889 or 31.6 percent. Petitioner's percentage increase in sales is similar to the percentage increase in production at Drummond and is more likely attributable to the increase in Drummond's sales than any other one factor. Even though petitioner was very successful, it had declared no dividends until the 1979 board meeting at which the Spousal Plan was approved. It appears that petitioner has paid no dividends since that time. Also, petitioner paid large salaries to Dugan's sons as well as to Dugan claiming deductions therefor in computing its taxable income. There is no legal requirement that petitioner pay dividends and often shareholders are content with the appreciation in the value of their stock that arises through retention of earnings. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326. Yet, an absence of profits paid back to the shareholders as dividends supports an inference that some *804 of the purported compensation in fact represents a distribution of profits. Charles Schneider & Co. v. Commissioner, supra at 153. Petitioner contends that the deductions disallowed to this petitioner for 1978 and 1979 in docket No. 21274-85 were attributable to excessive salaries that were reclassified as dividends. Therefore, petitioner states that it should be considered to have paid a $ 234,360.17 dividend in 1978 and a $ 408,724.69 dividend in 1979. We disagree with petitioner's argument. In addition to the fact that the record in these cases does not show to what extent the deficiencies in docket No. 21274-85 were attributable to disallowance of excessive salaries, such disallowance cannot be equated to a declaration of dividends for the purpose of determining whether salaries in the current year are excessive. At trial, both parties presented expert testimony regarding what was reasonable compensation to Dugan for 1979 and preceding years. Petitioner's expert testified at trial that reasonable compensation for Dugan would have been as follows: Reasonable
Compensation
Undercompensation
Year
Amount
Received
(Overcompensation)
1977
$ 463,000
$ 250,000
$ 213,000 1978
552,000
347,000
205,000 1979
652,000
941,045
(289,045)
*805 Respondent's expert testified to the following amounts: Maximum
Reasonable
Average
Amount
Year
Compensation
Compensation
Actually Paid
1978
$ 154,580
$ 90,820
$ 347,000
1979
187,020
106,500
941,045
The maximum compensation amount used by respondent's expert represents the highest compensation that a similar officer in a comparable company was paid in the particular year. The average compensation represents the average of the compensation paid to the highest paid officer of similar companies. As an underlying basis of comparison, respondent's expert used salaries paid by companies with sales comparable to petitioner's which were engaged in businesses in the same general industry as petitioner. Petitioner's expert used for comparison much larger companies, many of which were service companies, including such companies as E. F. Hutton and Merrill Lynch & Co., Inc. We conclude that the reasonable salary for Dugan in the year 1978 and 1979 arrived at by respondent's expert represents an approximate reasonable salary. However, it should be noted that petitioner's expert could not justify the total amount of the value of the spousal plan as being a reasonable *806 salary for Dugan in 1979, but attempted to justify it as compensation for prior years. We accept the conclusion of respondent's expert. The record does not contain much evidence as to the salary policy of petitioner during the 1979 time period. The evidence consists primarily of the salaries of petitioner's officers. According to petitioner's 1979 tax return, the only officer of petitioner besides Dugan and his three sons was Robert N. Olive. Mr. Olive received $ 36,891.20 of compensation for 1979. Tony, the next lowest paid officer, received over five times the amount of compensation that Mr. Olive received for the same year. The total compensation paid in 1979, excluding the value of the Spousal Plan to Dugan, to all the officers and employees of petitioner was $ 1,546,661.69. Of that amount, $ 1,318,497.49, or roughly 85 percent, was paid to Dugan and his three sons. There is no evidence that the Spousal Plan is part of a pattern of employee benefits given by petitioner to its employees. As mentioned above, Dugan was the only employee of petitioner to be covered by the Spousal Plan. None of Dugan's sons, all of whom were employed by petitioner, were included in the coverage *807 of the Spousal Plan. The record reveals no other similar plans covering employees of petitioner. At the time the Spousal Plan was created, Dugan owned 49 of the 50 outstanding shares of petitioner, with the final share being owned by Jennie Ruth. As we stated earlier, one of petitioner's arguments is that part of the compensation Dugan received in 1979 was for services rendered in prior years. We do not accept petitioner's argument that Dugan, who had complete control of petitioner, allowed himself to be undercompensated in prior years. [6] Also, we agree with the testimony of respondent's expert that Dugan was in fact not undercompensated in years prior to 1979. Petitioner argues that Ring Power Corp. v. United States, 63 AFTR 2d 89-878, 89-1 USTC par. 9109 (M.D. Fla. 1989), applies in the present situation. *808 The facts in Ring Power Corp. are to some extent similar, but are distinguishable from those in this case. In Ring Power Corp., the taxpayer, a corporation, was developed through the efforts of its founder and major shareholder. The taxpayer entered into an employment agreement with its major shareholder. The agreement, which was executed shortly after the major shareholder had surgery, provided for a benefit to be paid to the surviving spouse upon the major shareholder's death. At the time the agreement was entered into, it was believed that the major shareholder was in good health, yet he died only 2 months later. The court in Ring Power Corp. held that the payments to the surviving spouse were deductible under sections 162 and 404. The court concluded on the evidence before it that the employment agreement had been entered into for a legitimate business purpose. A factor considered by the court in reaching its conclusion was that the shareholder's compensation in prior years had not been adequate and the payments were compensation for the prior services. Another factor on which the court based its holding was that the benefits given to the major shareholder's *809 surviving spouse as part of the agreement were part of a pattern of employee benefits given by the taxpayer to its other employees. These facts and other facts considered by the court in the Ring Power Corp. case distinguished that case from the instant case. Petitioner argues that because of the settlement agreement entered into in docket No. 21274-85, respondent is precluded from now asserting that any part of the total compensation to Dugan during 1979 was not an ordinary and necessary business expense or was unreasonable in amount for purposes of section 162(a). We disagree. Respondent is bound by the settlement agreement for 1979 as to petitioner's taxes for that year, but not for other years. Furthermore, Dugan's compensation that was allowed as a deduction to petitioner in computing its 1979 tax liability was $ 501,045. The $ 501,045 amount was the compensation paid to Dugan in 1979 without consideration of, or inclusion of, the deferred compensation represented by the Spousal Plan. Here we are concerned with total compensation for Dugan of $ 941,045, which includes $ 440,476 of deferred compensation with respect to the Spousal Plan. Petitioner argues that if we *810 determine that Dugan's salary was excessive in 1979 when the value of the Spousal Plan is added to his cash payments we should prorate the excess between the cash payments and the Spousal Plan value and allow a partial deduction for payments under the Spousal Plan. Petitioner relies on Rev. Rul. 67-341, 1967-2 C.B. 156, dealing with deductibility by an employer of payments to a qualified plan where payments on behalf of one participant were excessive and payments on behalf of other participants were inadequate. The situation here is entirely different from that referred to in the Revenue Ruling. The plan here was not a qualified plan and there was only one participant. Also, the deductions claimed here are not for payments to the plan, but payments to the surviving spouse under the plan. Since the Revenue Ruling is inapposite here, we need not discuss the weight, if any, we might give to it if it were applicable. Since no part of the value of the Spousal Plan was reasonable compensation to Dugan when added to his cash compensation, no part of the Spousal Plan payments are deductible by petitioner. Since we have concluded that the Spousal *811 Plan was not an ordinary and necessary business expense of petitioner, we do not reach the issue of whether if the payments under the plan were deductible the amount of the Spousal Note would be deductible when the note was given or only when it was paid. The amount of the note was not deductible at any time since it was not an ordinary and necessary business expense of petitioner. The next issue is whether petitioner may deduct the commissions paid to Nelson Sons under the consignment agreement. As stated earlier, section 162(a) allows for the deduction of ordinary and necessary expenses of a trade or business. The legal analysis of the deductibility of the commissions is similar to that of the deductibility of the Spousal Plan payments, except that section 404 is not applicable to this issue. For instance, the amount of the expense must be reasonable in order to be deductible. Noyce v. Commissioner, 97 T.C. 670, 687 (1991). Also, there must exist a business purpose for the expense. B. Manischewitz Co. v. Commissioner, 10 T.C. 1139, 1144-1145 (1948). Respondent claims that the Consignment Agreement served no business *812 purpose, but was used as a way to distribute petitioner's profit to or on behalf of its shareholders. Petitioner contends that the Consignment Agreement served the business purpose of encouraging Bill, Randy, and Tony (the Nelson brothers) to further develop petitioner's relationship with Drummond. In support of its argument, petitioner relies on testimony that Dugan had been in search of a plan that would encourage the Nelson brothers to continue and expand petitioner's relationship with Drummond. There is no doubt that petitioner's relationship with Drummond is very important for the continuation and profitability of petitioner. Also, we do not doubt that Dugan may have desired to encourage his sons to nurture this relationship. But each of the Nelson brothers was an officer of petitioner and thus owed a fiduciary duty to petitioner. Hardy v. Hardy, 507 So. 2d 404, 406 (Ala. 1986). Each of the Nelson brothers was obligated to act in the best interest of petitioner. Therefore, if petitioner's relationship with Drummond was vital to petitioner's existence, there should not have to be an incentive plan in order for Bill, Randy, and Tony to try *813 to encourage that relationship. Instead, the Nelson brothers should be considered, because of their position as officers and directors, to have a duty to develop that relationship. We conclude from this record that the plan was nothing more than a scheme to get petitioner's profits out of the company and into the hands of Bill, Randy, and Tony without the company's paying tax on the profits. Therefore, we hold that the consignment agreement did not have a proper business purpose and the payments under it are not deductible by petitioner. Assuming that the Consignment Agreement payments should be considered to have the business purpose of compensation to Bill, Randy, and Tony, the deductions would still not be allowed because the payments would cause Bill, Randy, and Tony to have been unreasonably compensated. In deciding this, we would once again look to the factors of reasonable compensation taken from Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 119. Much of the discussion of the factors in the Mayson Manufacturing Co. case with respect to Dugan's compensation is applicable to the compensation of his three sons for the years 1982, *814 1983, and 1984. The record shows that after Dugan's death his three sons ran petitioner. The only expertise of Randy and Tony was their experience with petitioner. Bill had an engineering degree and a little over a year of work before he came to petitioner. The record shows that adding consignment commissions to their other salary in the years 1982 through 1984 results in unreasonable compensation to them. Respondent's expert testified and presented a report as to amounts of compensation which would be reasonable for Bill, Randy, and Tony for the years 1982, 1983, and 1984. The following chart provides a summary of his testimony: Maximum
Average
Compensation
Compensation
Bill Nelson
1982
$ 224,200
$ 134,570
1983
224,200
134,570
1984
307,850
159,180
Randy Nelson
1982
$ 200,600
$ 112,320
1983
200,600
112,320
1984
230,130
128,710
Tony Nelson
1982
$ 189,350
$ 107,590
1983
189,350
107,590
1984
188,440
109,560
The maximum compensation amount represents the highest compensation that a similar officer in a comparable company was paid in the particular year. The average compensation represents the average of the highest normal *815 pay practices of similar companies for similar officers. As we stated with respect to the testimony of respondent's expert with respect to Dugan's compensation, it is well reasoned and we accept it. On brief, petitioner argues that the facts in the present situation are comparable to those in Palm Beach Aero Corp. v. Commissioner, 17 T.C. 1169 (1952). We disagree. In Palm Beach Aero Corp. v. Commissioner, supra, the taxpayer was a corporation in the business of servicing and maintaining private aircraft and selling airplane parts, gasoline, and oil. During World War II, the taxpayer was involved in furnishing supplies and materials and a training base for the Civil Air Patrol. Because of a concern for secrecy and a desire to create more flexibility, a partnership was formed to handle part of the taxpayer's business. The partners in the partnership consisted exclusively of all but one of the major shareholders of the taxpayer. The partnership purchased, on credit, from the taxpayer some of its supplies and equipment and leased facilities from the taxpayer. The partnership maintained separate books and a separate *816 bank account and had its own bills and invoices and at least one employee. The Commissioner determined that the income of the partnership should be taxed to the taxpayer. We disagreed with the Commissioner, saying there was enough evidence to show that the partnership was a bona fide business organization which should not be ignored for tax purposes. There are several differences between the present situation and the situation in Palm Beach Aero Corp. v. Commissioner, supra. First, the partnership formed in Palm Beach Aero Corp. was formed for a valid business reason and not merely for the purpose of diverting profits to shareholders as in the instant case. Also, in the present situation, the partnership has no assets or employees, whereas the partnership in Palm Beach Aero Corp. had assets and employees. In Palm Beach Aero Corp., a segment of a business was moved into the partnership, while here there is only a shift of part of the income generated by dealings with one of petitioner's major customers. These factors distinguish the present situation from the situation in Palm Beach Aero Corp. Section 6653(a)(1) and (2) additions *817 : Respondent determined that the underpayments of tax for fiscal years 1984 and 1985 are due to negligence or intentional disregard of rules. Section 6653(a)(1) [7] provides that an addition to tax shall be imposed if any part of the underpayment of taxes is due to negligence or intentional disregard of rules or regulations. Negligence is the failure to use due care or to do what a reasonable and ordinarily prudent person would do in a similar situation. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964). Petitioners have the burden of proving that the additions to tax under section 6653(a)(1) do not apply for 1984 and 1985. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). *818 The record indicates that petitioner's 1984 and 1985 returns were prepared by Mr. Powell. As stated in United States v. Boyle, 469 U.S. 241, 251 (1985): When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. * * * In prior cases, we have held that reasonable reliance on experts suffices to avoid the addition to tax for negligence. Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976); Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968); Woodbury v. Commissioner, 49 T.C. 180, 200 (1967). The expert advice given to petitioner was incorrect, but we are convinced that petitioner relied upon that advice and acted in good faith. Therefore, we hold that petitioner was not negligent and is not liable for the additions to tax under section 6653(a)(1). Since we have concluded that petitioner is not liable for the addition *819 to tax under section 6653(a)(1) for 1984 and 1985, there is no addition to tax under section 6653(a)(2) for those years. Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
1. For a short period of Jan. 1 through June 30, 1980.↩
1. This is the amount shown on Nelson Sons partnership return. The stipulated figure is $ 523,781.↩
2. See Vesuvius Crucible Co. v. Commissioner, T.C. Memo. 1965-144, affd. per curiam 356 F.2d 948↩ (3d Cir. 1966).
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) IN GENERAL. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;↩
4. Sec. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN. (a) GENERAL RULE. -- If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year: * * * (5) OTHER PLANS. -- If the plan is not one included in paragraph (1), (2), or (3), in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan, but, in the case of a plan in which more than one employee participates only if separate accounts are maintained for each employee.↩
5. The Spousal Plan states in relevant part as follows: WHEREAS, the Officer (Dugan) is required to make important contributions to the operations of the Employer (petitioner) and the Officer desires to encourage the continuation of such efforts and contributions by the Officer in his present capacity as President of the Employer; and WHEREAS, Employer desires to provide further benefits in recognition of the Officer's services; * * *↩
6. See Willmark Service System, Inc. v. Commissioner, T.C. Memo. 1965-294, affd. 368 F.2d 359↩ (2d Cir. 1966).
7. SEC. 6653. FAILURE TO PAY TAX. (a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME, GIFT, OR WINDFALL PROFIT TAXES. -- (1) IN GENERAL. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) ADDITIONAL AMOUNT FOR PORTION ATTRIBUTABLE TO NEGLIGENCE, ETC. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).↩